Matter of Aleksander K. v Elena K. (2004 NY Slip Op 50156(U))

[*1]

Matter of Aleksander K. v Elena K.

2004 NY Slip Op 50156(U)

Decided on February 17, 2004

Family Court, Richmond County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 17, 2004

Family Court, Richmond County
In the Matter of a Proceeding for Visitation Under Article VI of the Family Court Act ALEKSANDER K., Petitioner,
against
ELENA K. Respondent. In the Matter of a Proceeding for Custody Under Article VI of the Family Court Act
JEANETTE B., Petitioner,
against
ELENA K. ALEKSANDER K., Respondents.
Docket No. V-1005-6/00G
APPEARANCES:

Sidney Siller, Esq.
11 Park Place
New York, N.Y. 10007
Attorney for Alexsander K.
Jason R. Leventhal, Esq.
60 Bay Street
Staten Island, N.Y. 10301
Attorney for Elena K.
Attorney for Jeanette B.
Mario J. Acunzo, Esq.
[*2]
31 Hasbrouck Road
Staten Island, N.Y. 10304
Law Guardian

Terrence J. McElrath, J.
The instant proceedings involve (1) Elena K.'s Supplemental Petitions, dated September 9, 2002, seeking telephone contact and visitation with her two children, Edward K. (dob 6/5/92) and Sofia [FN1] K. (dob 3/30/95) and (2) Jeanette B.'s petitions, dated July 24, 2002, seeking custody of the same subject children.
Procedural History
This entire matter initially came before the court on April 5, 2000, when Aleksander K., the paternal uncle of Edward and Sonia, came to court seeking an order for their custody. Mr. K. alleged that Elena K., the children's mother, was an alcoholic, had been taking drugs, and was suicidal. He further reported that Ms. K. was currently hospitalized at Bayley Seton Hospital. Mr. K. also indicated that his brother, Boris K., the children's father, had disappeared a week or two earlier, and was believed to be dead. Finally, Mr. K. also represented to the court that Ms. K. was believed to be involved in the disappearance and alleged murder of her husband. The court then issued process and ordered an ACS investigation. The court declined to issue a temporary order of custody but did issue a temporary order of protection on behalf of the children. It directed that Ms. K. stay away from the children and their home at all times, except for ACS-sanctioned visitation.
On April 14, 2000, the court assigned a law guardian, ordered additional investigations, and continued the temporary order of protection.
On May 3, 2000, based upon the reports received, the court vacated the temporary order of protection, and allowed Ms. K. to return home to her children.
On May 5, 2000, Ms. K. was arrested and charged with the murder of her husband.
On May 9, 2000, at Mr. K.'s request, the court reinstated the temporary order of protection, and directed Ms. K. to stay away from the children, their home and school at all times. Ms. K. was subsequently indicted for the murder of her husband and released on bail.
Following Ms. K.'s release from custody, the court continued its temporary order of protection, but did authorize telephone contact between Ms. K. and her children. The court also authorized weekly, professionally supervised visitation. These visits were supervised by Jeanette B. who was paid with estate funds authorized released by the Surrogate's Court. Ultimately Ms. B. filed her own custody petitions which also are the subject of these proceedings. During the next approximately two year period, proceedings were held in Supreme Court-Civil Term, Surrogate's Court, Supreme Court-Criminal Term, and the Family Court. Ms. K. declined to [*3]consent to Mr. K. having an order of custody until resolution of the criminal charges against her. Accordingly, this court conducted a protracted hearing to determine whether there were special circumstances which would authorize the non-parent Mr. K. to seek custody (see, Bennett v. Jeffreys, 40 N.Y.2d 543).
On March 26, 2001, the court found that special circumstances had been established. Since Ms. K. had theretofore objected to forensics until the issue of special circumstances could be resolved, the court then ordered forensics on the issue of custody. The forensics were not completed until the end of December 2001, and recommended that, pending resolution of the criminal charges against Ms. K., Mr. K. have custody and Ms. K. have visitation and telephone contact with the children. Since there was no agreement as to custody, the court then scheduled several dates in January 2002 for trial of the custody issue.
For varying reasons not attributable to the court, the trial could not be commenced on any of the scheduled dates. The court was then unable to reschedule the commencement of the custody trial due to the anticipated commencement of the criminal trial against Ms. K. Ultimately, the court decided to delay the custody proceedings until resolution of the criminal proceedings because the criminal proceedings were potentially dispositive of the custody proceedings. During this period of time, Ms. K. had continued telephone contact with the children, and weekly visits supervised by Ms. B.
On June 25, 2002, Ms. K. was found guilty of Murder in the Second Degree, her bail was revoked, and she was remanded into custody.
On July 16, 2002, Jeanette B. filed petitions for guardianship in the Surrogate's Court (File Nos. G43-44/2002).
On July 23, 2002, the court, recognizing that Ms. K. was facing mandatory incarceration, and would therefore be unavailable to care for her children, found that it would be in the children's best interests to permanently reside with their uncle. Accordingly, the court issued Mr. K. final orders of custody.
On July 24, 2002, Jeanette B. filed her petitions for custody of the children.
On August 5, 2002, Ms. K. filed her first petitions for telephone contact and visitation with the children. These petitions were dismissed, on procedural grounds, on August 6, 2002.
On September 12, 2002, Ms. K. filed her second petitions for telephone contact and visitation with her children.
On September 20, 2002, constrained by the requirements of Domestic Relations Law § 240(1-c), the court declined to order any temporary telephone contact or visitation until such time as the court could determine what, if any, visitation or telephone contact would be in the children's best interests. The parties were also unable to agree on whether the children were of sufficient age and maturity to assent to visitation. Accordingly, the court indicated that it wanted new forensics on this issue, and the broader issue of what, if any, visitation would be in the children's best interests. The court also directed the parties to try to agree upon a clinician. It then took the parties several months to agree upon a clinician to conduct the forensics. Finally, upon the consent of all the parties, the court ordered Robert J. Kaplan, M.D. to conduct the forensics.
On September 24, 2002, Ms. K. received a custodial sentence of twenty-two years to life.
[*4]
On October 21, 2002, Mr. K. filed petitions for guardianship in the Surrogate's court (File Nos. G72-3/2002).
On October 29, 2002, the court conducted an in camera interview of Edward and Sonia regarding their desire to visit with their mother and their desire to live with Ms. B. As a result of that interview, the court found that they were of sufficient age and maturity to assent to visitation with their mother.
On June 2, 2003, the Surrogate's Court denied Ms. B.'s petition for guardianship, and appointed Mr. K. general guardian of the person and property of the children.
On July 22, 2003, the hearing on Ms. K.'s visitation petition commenced. Additional testimony was taken on October 20, 2003, October 21, 2003, January 6, 2004 and January 7, 2004.
Evidence
The court heard the testimony of Dr. Kaplan, who testified as a court witness. On Ms. K.'s case, the court heard the testimony of Marie Noonan, a Senior Corrections Counselor employed by the N.Y.S. Department of Correctional Services, and the testimony of Ms. K. On Mr. K.'s case, the court heard the testimony of Michael Epstein, Ph.D., a psychologist who is the children's current therapist in Florida; the testimony of Alexander Sherman, M.D., a New York psychiatrist who saw the children in Florida on two consecutive days in June 2003; the testimony of Marvin Meyers, Ph.D., a psychologist who saw the children prior to their move to Florida at the end of December 2002; and the testimony of Mr. K. The court also re-interviewed the children, in camera, regarding their move to Florida and their current views on visitation with their mother.
The court also received, in evidence, Dr. Kaplan's written report (Court Exhibit #1), a partial record of Ms. K.'s hospitalization at Bellevue Hospital Center in December 2000 (Respondent/Uncle's "A"), the record of Ms. K.'s hospitalization at St. Vincent's Catholic Medical Centers in April 2000 (Respondent/Uncle's "B"), and a partial record of Ms. K.'s hospitalization at Bellevue Hospital Center in December 2000 (Respondent/Uncle's "C").
Applicable Statutory Law
In July 1998, Section 240 of the Domestic Relations Law was amended to add a new subdivision 1-c [see, Laws of 1998, Chapter 150, Section 1]. As a result, DLR § 240 (1-c) now prohibits a court from making an order providing for visitation by a person who has been convicted of the murder of the parent of a child who is the subject of the proceeding. An exception can be made when the child is both of suitable age to assent and does assent [see, DLR § 240 (1-c)(b)(i)(A)] and the court finds that such visitation would be in the best interests of the child [see, DLR § 240 (1-c)(b)(ii)].
[*5]
Domestic Relations Law §240(1)(a) requires the court, in determining custody or visitation, to consider the effect of domestic violence upon the best interests of the children when allegations of domestic violence have been proven by a preponderance of the evidence.
Law Guardian's Position
The Law Guardian opposes Ms. K.'s petition for visitation and telephone contact with Edward and Sonia and also opposes Ms. B.'s petition for their custody.
Discussion - Ms. K.'s Visitation Petition
At the outset of each in camera interview of Edward and Sonia, the court assured them that what they said during the interviews would be kept confidential, and would not be revealed to anyone, particularly their mother, with one notable exception. The court advised the children that, in the event that the court's decision were to be appealed, the Appellate Division would then be able to review and consider what they had said. In light of the assurances given to Edward and Sonia, the court will in no way reveal, intimate or discuss what they said. Suffice it to say that the court has carefully weighed and considered Edward and Sonia's general feelings, views and desires about visiting with their mother, and their specific feelings about visiting with her in prison.
Having been convicted of the second degree murder of Edward and Sonia's father, Ms. K. is clearly subject to the mandatory provisions of DRL § 240 (1-c). In this court's view, the net effect of the operation of DLR § 240 (1-c) is that Ms. K. no longer has a right to visitation with her children. She forfeited her right to visit with them upon her conviction for murdering their father. If there is any right to visitation, it is the right of the children to see their mother, but, even then, only if the court determines that it is in their best interests to do so.
In determining whether visitation would be in their best interests, the court has considered the competing testimony of Dr. Kaplan and the expert witnesses presented by Mr. K. Dr. Kaplan recommended that Ms. K. have liberal visitation with the children, subject only to the limitations imposed by her incarceration. He recommended that the visitations begin immediately and include both overnights and extended summer visitation. He also recommended unlimited telephone contact. Mr. K.'s expert witnesses all recommended against visitation.
In conducting his evaluation and in making his recommendations, Dr. Kaplan primarily focused on Ms. K., and only secondarily focused on Edward and Sonia. Dr. Kaplan appears to have found Ms. Keijliches a sympathetic figure. He clearly was intrigued and enchanted by her "rags to riches" tale of life in the Gorbachev era and her emigration to the United States. In focusing almost entirely on Ms. K., Dr. Kaplan never satisfactorily explained to the court why he felt that visitation would be in the children's best interests. When explicitly asked by the court as to why he felt that visitation would be in the children's best interests, Dr. Kaplan once again [*6]focused on Ms. K., and indicated that it was because she was their mother, she had raised them, and she should remain a part of their lives. He never narrowly addressed the central issue of how, or why, they would benefit from visitation with their mother, how visitation would enhance their lives, or how the absence of visitation would be detrimental to them.
In contrast, Mr. K.'s expert witnesses focused directly on Edward and Sonia. They addressed the potential impact of visitation upon them, and testified as to what they perceived to be in the children's best interests. All of these witnesses articulated clear and specific reasons why they did not believe that visitation would be in Edward and Sonia's best interests. They testified that the children were still settling into a new life with their uncle in Florida, and that contact with their mother had the real and continuing potential to jeopardize their adjustment to that life. There was also the real concern that, given the apparent animosity between Ms. K. and Mr. K., Ms. K. would not only be unable to foster and support the children in developing a beneficial relationship with Mr. K., but could quite possibly undermine it.
In considering the weight to be given the competing testimony of the expert witnesses, the court has specifically considered and weighed the fact that Dr. Kaplan was called as a court witness, was not paid by either party, and was therefore disinterested. The court has also considered and weighed the fact that Mr. K.'s expert witnesses were paid significant amounts of money for their services and testimony. In deciding which testimony to give the greater weight to, the court notes that the recommendations of forensic experts are not determinative, but are only one factor to be considered (see, Matter of Castellano v. England, 275 A.D.2d 412; Matter of Prete v. Prete, 193 A.D.2d 804). The court believes that it is not required to give greater weight to the testimony of a disinterested court witness merely because it came from a court witness. The source of the testimony is merely an additional factor to be considered. Having considered all the relevant factors, the court finds the testimony of Dr. Kaplan to be unpersuasive and the testimony of Mr. K.'s expert witnesses to be compelling.
The court has also considered the fact that, in murdering Edward and Sonia's father, apparently while the children were in their parents' care and present in their home, Ms. K. committed the ultimate act of domestic violence. DRL § 240(1)(a) requires the court, in determining custody or visitation, to consider the effect of domestic violence upon the best interests of the children. In addition, the appellate courts have found that, given the detrimental effects of domestic violence upon children, Article 10 of the Family Court Act was drafted in sufficiently broad terms to encompass domestic violence as a permissible basis upon which to make a finding of neglect (see, Matter of Deandre T., 253 A.D.2d 497; see also, Matter of Lonell J., 242 A.D.2d 58; Matter of Billy Jean II, 226 A.D.2d 767; Matter of Tami G., 209 A.D.2d 869; Matter of Theresa CC., 178 A.D.2d 687). Proven acts of conduct amounting to parental neglect are relevant factors to be considered when determining issues of custody or visitation. In murdering Edward and Sonia's father, Ms. K. removed him from their lives, and denied them his love, affection and guidance. In addition, the direct result of her own actions was to cause herself to be removed from their lives, effectively leaving them orphans.
The court has also considered what visitation with Ms. K. would necessarily involve. The children have no other family in New York. They would periodically have to disrupt their new lives in Florida and travel up to New York, where they would continually be reminded of their prior lives and forced to address what their mother did to their father. While the [*7]arrangements for family visitation at Bedford Hills may be "child friendly", Bedford Hills is nonetheless a maximum security prison facility. As a result, the children would be subjected to security procedures attendant upon their visiting with their mother in a maximum security prison setting. Edward and Sonia are intelligent and observant children and, unlike younger children who might not be aware of their physical surroundings, they would be very well aware that they were in a prison. If they were to have overnight visits, albeit in a trailer on prison grounds, they would likely find themselves as confined, restricted and deprived of their liberty as their mother was.
Finally, the court has considered what, if anything, visitation with Ms. K. would add to Edward and Sonia's lives. Ms. K. is presently serving a twenty-two (22) years to life sentence for the murder of their father. She will not be eligible for parole until June 2024. Having lost her wealth, lifestyle and liberty, it may well be that her children are all that she has left. It is therefore understandable why she would want to retain contact with them. Edward and Sonia, however, need to establish a new life for themselves, which, of necessity, will be apart from their mother. Ms. K. cannot, and will not, be able to offer them meaningful love, affection, guidance or parenting. Edward is almost 12 years old, and Sonia is almost 9 years old. Ms. K. will not even become eligible for parole until Edward is 32 years old and Sonia is 29 years old. Even at that time, unless current federal immigration law is amended, Ms. K. will likely be subject to mandatory deportation.
Ms. K. has failed to affirmatively show how Edward and Sonia's lives would be enhanced or enriched by visitation or contact with her. Their immediate future is in Florida with their uncle. It is he, and his wife, who, of necessity, will raise them, support them and love them. All indications are that Mr. K. and his wife are currently doing an excellent and outstanding job in doing so. Given what Edward and Sonia have undergone, they appear remarkably well-adjusted. Anything that would jeopardize that adjustment - and the court is persuaded that visitation with Ms. K. could do so - cannot be countenanced.
Discussion - Ms. B.'s Custody Petition
Ms. B. filed her custody petitions on July 24, 2002, the day after Mr. K. was granted a final order of custody of Edward and Sonia. The court has ascertained, and carefully considered, the children's feelings and desires regarding living with Ms. B. The court has considered that the children have never lived with Ms. B., and that her only involvement with them was as a paid, professional supervisor of their weekly visitation with Ms. K. The court has considered that they have not seen Ms. B. since the weekend immediately before June 25, 2002, when Ms. K.'s bail was revoked and she was taken into custody. The court has considered that the children have now been living with Mr. K. for almost four years. They are doing well and thriving in his care. The court has considered that continued placement with Mr. K. would afford the children, who have already experienced a great deal of turmoil and disruption in their lives, a reasonable degree of stability. A change of custody to Ms. B. would only cause further disruption, and would amount to an experiment, to see how they would adjust in her care. The court has a proven record [*8]regarding how Mr. K. has cared for the children. The court can only speculate as to how Ms. B. would do. The court has also considered the timing of Ms. B.'s petitions and the possibility that her petitions were more motivated by a desire to provide Ms. K. with continued visitation than a bona fide desire to have custody.
After considering all of these factors, the court does not believe it to be necessary or in Edward or Sonia's best interests to alter the current situation and place them in the custody of Ms. B. This decision is being made notwithstanding the fact that the court did not hold a hearing. The court deems it unnecessary to hold a full, evidentiary hearing on Ms. B.'s custody petitions. Although couched in terms of being custody petitions, Ms. B.'s petitions are, in reality, petitions to modify Mr. K.'s orders of custody. A court is not required to hold a hearing on a modification petition without a preliminary evidentiary showing that there has been a change in circumstances and that it would be in a child's best interests for custody to be modified. Even a parent seeking a change in custody is not automatically entitled to a hearing, but has to make a sufficient evidentiary showing to warrant a hearing. (see Engeldrum v. Engeldrum, 306 A.D.2d 242; Matter of Johnson v. Semple, 273 A.D.2d 311; Matter of Ann C. v. Debra S., 221 A.D.2d 338). There is no reason to give Ms. B. greater rights than a parent would enjoy. In addition, a court should not be required to hold a full, evidentiary hearing merely because a party has filed a custody petition and seeks such a hearing. There must be some preliminary basis to believe that an order of custody would be in the children's best interests.
In the instant proceeding, Ms. B. has failed to make a preliminary evidentiary showing that there was a significant change of circumstances such that it would be in Edward and Sonia's best interests to modify their uncle's orders of custody. Edward and Sonia are doing well with Mr. K. and there is no basis to believe that a change in custody would improve their situation. There similarly is no reason to believe that it would be in their best interests to be taken from him and moved to Ms. B. Consequently, there is no need or reason to hold a full, evidentiary hearing on her petitions.
Discussion - Current Custody Orders
Subsequent to Mr. K. having obtained final orders of custody from this court, Mr. K. petitioned the Surrogate's Court for guardianship of Edward and Sonia. The parties all subjected themselves to the jurisdiction of the Surrogate's Court. On June 2, 2003, Mr. K. was appointed General Guardian of the Persons and Property of Edward and Sonia. No appeal was taken from that order.
Family Court and Surrogate's Court are both superior trial courts of limited jurisdiction. They have concurrent jurisdiction in certain areas, e.g., adoptions and guardianships, and exclusive jurisdiction in other areas. Neither court is superior to the other and neither court's order takes priority over the other's. The Family Court's order of custody, dated July 23, 2002, was not superceded or modified by the Surrogate's Letters of Guardianship, dated June 2, 2003. Both are currently in full force and effect. While the orders are currently harmonious and do not conflict with each other, the possibility exists, however unlikely it might be, that a future [*9]modification of one or the other court's orders could result in conflicting orders. Accordingly, it is appropriate that action now be taken to insure that this cannot occur. Family Court and the Surrogate's Court are both in agreement that Mr. K. is the appropriate legal caretaker of Edward and Sonia, whether it be as legal custodian or legal guardian. All parties consented to the Surrogate's Court exercising jurisdiction over the matter. In so doing, the parties have, in a sense, abandoned the Family Court custody proceeding and orders. In any event, the orders of the Surrogate's Court essentially give Mr. K. the same powers as to the persons of the children as were granted him by the custody orders issued by the Family Court. The orders of the Surrogate's Court, however, explicitly make Mr. K. the person responsible for the children's property. In light of this, it is this court's opinion that it makes most sense to have only one court's orders remain in full force and effect, and they should be the orders most recently entered by the Surrogate's Court.
Decisions and Orders
For the reasons stated above, the court finds that Elena K. has failed to establish, by a fair preponderance of the evidence, that visitation or telephone contact with her would currently be in Edward or Sonia's best interests. Accordingly, it is hereby ORDERED, that her supplemental petitions be, and they hereby are, dismissed. This is without prejudice to the right of Edward and/or Sonia, through their Law Guardian, to request visitation with their mother if, after the 2004/2005 school year, they choose to do so. Towards that end, the Law Guardian is authorized and directed to maintain contact with Sonia and Edward, and ascertain their desires.
For the reasons stated above, it is hereby ORDERED, that Jeanette B.'s petitions for custody be, and they hereby are, dismissed.
For the reasons stated above, on the court's own motion, it is hereby ORDERED, that the final orders of custody, dated July 23, 2002, be, and they hereby are, vacated.
Dated:Staten Island, New York
March 10, 2004
ENTER:

 Terrence J. McElrath 
PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT AN APPEAL
 FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT [*10]OF
 THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT,
OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON
THE APPELLANT, WHICHEVER IS EARLIEST.
Decision Date: February 17, 2004
Footnotes

Footnote 1:Although this child's given name is Sofia, she prefers to be called Sonia, and, accordingly will hereafter be referred to as Sonia throughout this decision and order.